**Wolfgang ARNOLD, Plaintiff-Appellant,**

v.

**INTERNATIONAL BUSINESS MACHINES CORPORATION et al., Defendants-Appellees.**

No. 78-3458.

United States Court of Appeals, Ninth Circuit.

Argued Oct. 6, 1980.

Submitted Oct. 20, 1980.

Decided Feb. 5, 1981.

---

**3.** According to *The Random House College Dictionary*, First Edition, 1980: 1. To dress in one's best clothes (usually fol. by *up* ).

Richard A. DeSantis, Los Angeles, Cal., for plaintiff-appellant.

C. Douglas Floyd, Pillsbury, Madison & Sutro, San Francisco, Cal., for defendants-appellees.

Before WALLACE and HUG, Circuit Judges, and CROCKER,* District Judge.

* Honorable Myron D. Crocker, United States District Judge, Eastern District of California, sitting by designation.

**1352**

WALLACE, Circuit Judge:

Arnold brought suit against International Business Machines (IBM) and several of its employees (collectively, defendants) for alleged violations of his civil rights. The violations about which Arnold complains arose out of criminal action taken against him for the theft of IBM documents and trade secrets. He appeals from the district judge's entry of summary judgment for defendants and from the district judge's denial of his discovery motion. We affirm.

**I**

In 1970, IBM became aware that certain documents, which involved what IBM considered proprietary information and trade secrets, had been stolen and were in the possession of outsiders. The information contained in these documents was the drawings and specifications for certain IBM disc drives. IBM's efforts in the next two years to locate the disloyal source within IBM and the outside buyers of these documents were largely unsuccessful. In December 1972, IBM hired Richard Callahan as manager of security for its San Jose operation. Callahan's primary responsibility was the protection of IBM's proprietary information. He undertook to investigate the theft of the drawings for the "Merlin" or 3330 disc drive and to discover whether information relating to IBM's newest disc drive, the "Winchester" or 3340, had also been leaked to outsiders.

Callahan's first breakthrough was his discovery that David Bourget had at one time purchased stolen IBM Merlin documents. Bourget admitted this and agreed to assist Callahan in discovering the identity of the IBM source. In March 1973, Bourget contacted Phillip Steckel, the person from whom he had purchased IBM documents. Bourget expressed to Steckel his interest in purchasing IBM Winchester drawings. Steckel agreed to contact his IBM source and to consider telling Bourget the name of the source.

On April 4, 1973, IBM employees met with representatives of the California Attorney General's Office and the Santa Clara County District Attorney's office to discuss the possibility of a criminal investigation of the document thefts. At that meeting, it was decided that the Santa Clara authorities would investigate the activities of Steckel and the IBM insider. Santa Clara Deputy District Attorney Albert Bender was in charge of the legal and prosecutorial matters. The investigation itself was headed by Captain Larry Stuefloten of the San Jose Police Department. Stuefloten and Bender formed an investigative body called the Task Force. The members of the Task Force were persons from the District Attorney's office and police department, and Callahan. Callahan provided the Task Force with the information that IBM had gathered concerning the leak of the proprietary information.

During IBM's earlier investigation, Arnold's name had come up. Shortly after IBM discovered the leak of the information concerning its disc drives, it discovered that Wesley Powers, the President of Memory Magnetics, Inc. (MMI), was in possession of several Merlin documents. Powers admitted this possession, and agreed to tell IBM how he had obtained them if IBM would give him a "hold harmless" agreement. IBM agreed to hold Powers, MMI, and several MMI employees, including Arnold, Steckel, and others, harmless for their involvement, if any, in the possession of IBM proprietary information concerning Merlin. Powers apparently agreed to provide IBM with information that would assist it in locating the leak within IBM. IBM was unsuccessful in locating the leak, and claimed that Powers was not telling all that he knew. A 1971 IBM memorandum indicates that Arnold had told IBM that another small computer company had obtained certain IBM information and that he knew how they had secured the information. The memorandum states that IBM planned to interview Arnold. A January 1973 document prepared by Callahan outlining potential leads contained Powers' name but not Arnold's. A February 1973 IBM memorandum lists persons who might have information concerning the losses of the IBM documents. The persons were divided into three groups: (1) those who IBM was confident

knew the source of the drawings; (2) those who IBM thought might know the source; and (3) "all others who may be of some use." Arnold was placed in the second group, but only as an employee of Powers' at MMI. This memorandum also indicates an intent to interview Arnold.

After the Task Force was formed, Bourget continued to contact Steckel, and the San Jose Police Department tape recorded these meetings. On April 14, Bourget purchased from Steckel a Winchester drawing and the name of the IBM insider. Steckel identified the IBM source as Ramon Serrata. Steckel stated that Arnold also had Merlin documents. He indicated that MMI was now Computer Disc Mastertape (CDM), and that Arnold was running that corporation.

Steckel further indicated that he had access to drawings for a third IBM disc drive named the 2314. Bourget expressed an interest in purchasing drawings for the 2314. Steckel agreed. Steckel also told Bourget that MMI had built a 2314 after Steckel had provided MMI with the IBM drawings. Steckel stated that Arnold was the chief engineer at MMI and had been in charge of the building of the 2314 from the IBM drawings. Steckel also said that Adolph Jarmann had been an engineer with MMI and would be able to help Bourget with any electrical problems encountered in building the 2314. Several meetings were held between Bourget, Steckel, Jarmann and others in the weeks that followed. Jarmann admitted that he had received a set of 2314 drawings and still had his set.

In early June of 1973, members of the Task Force interviewed several former MMI employees who had worked on some phase of the production of the 2314. These people indicated their belief that the 2314 had been produced from stolen drawings, as MMI did not have the resources to produce its own drawings or to reverse engineer IBM's 2314 in such a short time. Many of them reported their belief that Powers, Arnold, Steckel, Jarmann, or some combination of these men, had been responsible for obtaining the IBM drawings for MMI. One of the persons interviewed was Donald Town. Town stated that Arnold was re-

sponsible for discovering whether the drawings provided MMI were authentic. According to Town, after Arnold had examined the documents he would turn them over to MMI draftsmen, who would copy the documents by hand and return them to Arnold. Town stated that Arnold had taken at least some of the IBM drawings home with him and stored them there.

On June 28, 1973, warrants were issued for the arrests of Serratta, Steckel, Jarmann, Powers, Arnold, and others. The felony complaint on which the warrant was based contained 18 counts against the various defendants. Arnold was charged with criminal conspiracy, theft of trade secrets, and receiving stolen property. A warrant was also issued for the search of Arnold's residence, and for the premises of CDM. The criminal complaint and the affidavits supporting the warrants were signed by Sergeant Richard Frechette, a member of the San Jose Police Department and of the Task Force. The information contained in Frechette's affidavits against Arnold included background information supplied by Callahan concerning the leaks and the initial contacts with Bourget; Frechette's personal knowledge, and information supplied by other police officers, concerning the activities of the Task Force and the recorded conversations that implicated Arnold; and Frechette's interviews with Town and others.

Arnold was arrested the next day, June 29, 1973. The search of Arnold's residence also occurred on June 29. During the search, many documents were discovered that contained the IBM name or some other feature identifying IBM. Leighton Wood, an IBM employee, accompanied the police on their search of Arnold's residence to determine which materials were IBM documents. Bender described the reliance on Wood's judgment concerning what belonged to IBM as "a hundred percent." On July 31, 1973, the same defendants were indicted by the Santa Clara County Grand Jury. Arnold was indicted for theft of trade secrets, criminal conspiracy to steal trade secrets, and criminal conspiracy to receive and conceal stolen property.

In January 1974, Arnold's motion to suppress the evidence that had been seized at his residence was granted. The judge held that there was probable cause to believe that Arnold had the IBM drawings. He ruled, however, that the only information indicating that those drawings were at Arnold's residence was the statement that Town had made to the effect that Arnold sometimes took the IBM documents home with him. The judge held that because Town's statement was based on his information and belief of facts that occurred over two years before the search, the information was stale and insufficient to support a valid search warrant.

In April 1974, the district attorney dismissed the charges against Arnold, indicating that the evidence that had been suppressed was "the heart and soul" of his case. At that time, Arnold executed a covenant not to sue the San Jose officials. In September and October 1975, the Santa Clara Superior Court, pursuant to a petition by IBM, adjudged IBM the owner of most of the documents seized from Arnold's residence, and ordered the property returned to IBM.

## II

In June 1976, Arnold initiated this lawsuit. In his amended complaint, Arnold alleges causes of action pursuant to 42 U.S.C. §§ 1983 and 1985 against IBM and several of its employees. Arnold alleges that they failed to disclose to the law enforcement officials evidence that would have been exculpatory to him in the criminal investigation, and that they caused the preparation of the arrest and search warrants, knowing that the affidavits in support of those warrants contained misstatements of facts and failed to disclose the true facts. Arnold further alleges that after his arrest he was detained for six hours before he was permitted to arrange for bail because several IBM employees deliberately delayed the delivery of the arrest warrant. Arnold asserts that these actions were part of a conspiracy between defendants and the state officials, and that defendants' activities were undertaken under color of state law. Arnold alleges that the motivation for

defendants' acts was defendants' desire to thwart competition from smaller concerns in the computer industry.

The district judge granted the defendants' motion for summary judgment. The district judge held that Arnold had shown no facts to support his claim that defendants were the cause of his arrest, search, and indictment. Rather, the judge observed that the evidence implicating Arnold was derived solely from the recorded conversations and interviews that took place in April and May of 1973. The judge stated that "the uncontroverted affidavits of police investigators and prosecutors establish that no employee or agent of IBM said anything to any member of such investigating task force or did anything that caused Plaintiff to be arrested or his home and office to be searched."

We read the district judge's decision as holding that the material facts were undisputed that defendants were not the proximate cause of Arnold's injuries. Having failed to establish proximate cause, Arnold could not succeed under any of the legal theories he advanced under the civil rights statutes. Therefore, the district judge found it appropriate to grant summary judgment to the defendants on all counts. Although the parties have raised many issues, we do not think the district judge reached any issue other than proximate cause, and therefore, that is all that is before us in this appeal.

## III

On review of a grant of summary judgment, we must employ the same standard that governs the trial court: we may affirm a grant of summary judgment pursuant to Rule 56 only if we find that no genuine issue of material fact exists and that the moving party is entitled to prevail as a matter of law. *May Department Store v. Graphic Process Co.*, No. 78–1228, 637 F.2d 1211 at 1213–14 (9th Cir. 1980); Fed.R.Civ. P. 56(c). We first examine whether a failure to demonstrate a causal connection is fatal to a section 1983 or section 1985 cause of action. We will then examine whether any dispute of material fact existed on this issue in this case.

## A

■ Causation is a concept that is not often discussed or explicitly stated in civil rights cases. When courts examine the elements of civil rights causes of action, they tend to focus on the substantive aspects of liability under the statutes. *See, e. g., Sykes v. California*, 497 F.2d 197, 200 (9th Cir. 1974). Although causation is not stated explicitly in these formulations, it is an implicit requirement. A section 1985 cause of action requires the plaintiff to show "that the acts done in furtherance of the conspiracy *resulted*" in his injury. *Id.* (emphasis added).[1] This is the equivalent of saying that the plaintiff must show that the defendants *caused* his injury. In a section 1983 cause of action the plaintiff must show that the defendants have deprived him of a right. *Id.* The language of the statute shows this can be a direct or indirect deprivation. It creates liability for any person who "subjects, or causes to be subjected" particular persons to the deprivation of particular rights. ·Thus, liability under section 1983 can be established by showing that the defendant personally participated in a deprivation of the plaintiff's rights, or caused such a deprivation to occur.

■ The causation requirement of sections 1983 and 1985 is not satisfied by a showing of mere causation in fact. *See* W. Prosser, Law of Torts § 41 at 238–39 (4th ed. 1971). Rather, the plaintiff must establish proximate or legal causation. In *Hoffman v. Halden*, 268 F.2d 280 (9th Cir. 1959), *overruled in part on other grounds, Cohen v. Norris*, 300 F.2d 24 (9th Cir. 1962), we examined the allegations of a deprivation of civil rights arising out of the plaintiff's commitment to a mental institution by court order. We observed that the proximate cause of the plaintiff's injury would ordinarily be the court order, and not the various steps preliminary to the court order.

*Hoffman v. Halden, supra*, 268 F.2d at 296. Without the preliminary steps, no court order could have issued, and no commitment could have occurred. Thus, the preliminary steps were a cause in fact of the commitment. Because the defendants in the case were persons involved in those preliminary steps, we had to determine, in reviewing the trial court's dismissal for failure to state a cause of action, whether the plaintiff had alleged facts sufficient to raise those preliminary steps to the level of proximate cause. *Id.*

In a more recent case, we said:

A person "subjects" another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits. to perform an act which he is legally required to do that *causes* the deprivation of which complaint is made.... Moreover, personal participation is not the only predicate for section 1983 liability. Anyone who "causes" any citizen to be subjected to a constitutional deprivation is also liable. The requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.

*Johnson v. Duffy*, 588 F.2d 740, 743–44 (9th Cir. 1978) (emphasis added). The standard for causation stated in *Johnson v. Duffy, supra*, is more than that of causation in fact. The statement closely resembles the standard "foreseeability" formulation of proximate cause. *See* Prosser, *supra*, § 43. *Cf. Beard v. Mitchell*, 604 F.2d 485, 496 (7th Cir. 1979) (approving district court's proximate cause instruction in a *Bivens* case).

■ We should point out that, in the context of this case, the determination of proximate cause is different from the determination of state action.[2] In some cases,

---

1. We point out that if the causal connection is absent, we will not need to decide whether Arnold was a member of a class against which "an invidiously discriminatory class-based animus" could be held so as to deprive him of the equal protection of the laws pursuant to sec-

tion 1985(3). *See Life Ins. Co. v. Reichardt*, 591 F.2d 499, 502–03 (9th Cir. 1979).

2. The "under color" of state law requirement of section 1983 is equivalent to the "state action" requirement of the Fourteenth Amendment.

these determinations will be quite similar. In *Martinez v. California,* 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980), the plaintiffs brought a section 1983 action against a state parole board for the killing of a 15 year old girl by a parolee. The plaintiffs alleged that the parole board's action in granting the parole to the killer deprived the decedent of a right secured by the Constitution and laws of the United States. The Supreme Court held that the action of the killer five months after his parole could not "be fairly characterized as state action." *Id.* at 285, 100 S.Ct. at 559. The Court emphasized "that not every injury in which a state official has played some part is actionable under [section 1983]." *Id.* In reaching its conclusion, however, the Court observed that the death was "too remote a consequence of the parole officers' action to hold them responsible under the federal civil rights law." *Id.* Although the Court saw no need to decide the proximate cause issue, it appears to have employed elements of proximate cause analysis in determining state action. This can occur when the defendants are state officers. If the actions of the state officers are not the proximate cause of the plaintiff's injuries, then there is no state action.

The similarity between proximate cause and state action often disappears when the defendants are private parties, rather than state officials. In most cases involving private defendants, there is no proximate cause issue at all. Usually, it is clear that the defendants caused the plaintiff's injury. The issue is whether the particular conduct is purely private, and thus immune from section 1983 liability, or is state action. *See, e. g., Flagg Bros., Inc. v. Brooks,* 436

U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978); *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); *Shelley v. Kraemer,* 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). The case before us presents a different problem. Here, Arnold's injuries were the result of state action. State officials performed the acts of arresting, searching, and indicting about which Arnold complains. Some circuits have examined the liability of private parties involved in police arrests in terms of state action. *See, e. g., Butler v. Goldblatt Bros., Inc.,* 589 F.2d 323 (7th Cir. 1978), *cert. denied,* 444 U.S. 841, 100 S.Ct. 82, 62 L.Ed.2d 53 (1979); *Smith v. Brookshire Bros., Inc.,* 519 F.2d 93 (5th Cir. 1975), *cert. denied,* 424 U.S. 915, 96 S.Ct. 1115, 47 L.Ed.2d 320 (1976). In this case, however, the question before us is whether there is any evidence that the private defendants, IBM and its employees, caused those acts to occur within the meaning of sections 1983 or 1985.

**B**

■ If Arnold could point to any fact that would tend to show that defendants had some control or power over the Task Force, and that defendants directed the Task Force to take action against Arnold, there would certainly be a dispute of material fact on the issue of proximate cause sufficient to reverse the summary judg-

United States v. Price, 383 U.S. 787, 794–95, n.7, 86 S.Ct. 1152, 1157 n.7, 16 L.Ed.2d 267 (1966). In *Life Ins. Co. v. Reichardt, supra,* we said that "[m]ere state action is insufficient to support a section 1983 cause of action." *Id.* at 502. We were not stating a new standard for the under color of state law requirement. Rather, we were applying the Supreme Court's rule for section 1983 cases involving private defendants that

"where the impetus for the discrimination is private, the State must have 'significantly involved itself with [the] invidious discriminations.'" *Moose Lodge No. 107 v. Irvis,* 407

U.S. 163, 173, 92 S.Ct. 1965, 1971, 32 L.Ed.2d 627 (1972) (quoting in part *Reitman v. Mulkey,* 387 U.S. 369, 380, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967)).

*Life Ins. Co. v. Reichardt, supra,* 591 F.2d at 501. Thus, *Reichardt* merely reflects the well-established principle that private discrimination must be closely connected to state action to be subject to section 1983 liability. *Cf.* 1 C. Antieau, Federal Civil Rights Acts—Civil Practice, § 57 at 103 & n.48 (2d ed. 1980) (suggesting that *Reichardt* states a different standard for "under color" of state law).

ment. Arnold has, however, failed to show this.

It is undisputed that IBM had some involvement with the Task Force. The Task Force would not have existed but for IBM. IBM brought the information concerning possible criminal activity to the authorities. IBM turned over to the Task Force the information that it had gathered concerning the possible leaks of trade secrets during its own investigation. An IBM employee, Callahan, was a member of the Task Force. The Task Force relied heavily, perhaps exclusively, on IBM personnel in determining what information constituted trade secrets, and what documents were IBM documents. The district attorney relied on IBM attorneys to provide appropriate witnesses to testify before the grand jury. IBM supplied the Task Force with "buy money" to enable Bourget to purchase documents and information from the suspected thieves, while under surveillance. IBM also provided the Task Force with money for expenses incurred during the course of the investigation that could not be covered by the local budget. IBM also rented an airplane that was used by members of the Task Force for travel during the course of the investigation. It is clear that "but for" IBM's involvement, there would have been no investigation, and Arnold never would have been arrested or indicted or had his residence searched.

There is nothing in the record, however, to indicate that defendants exerted any control over the decision making of the Task Force. Deputy District Attorney Bender testified that the Task Force used the information supplied by IBM to determine which companies might be in possession of IBM documents, but that the Task Force conducted a full and independent investigation. Bender and Sergeant Frechette both testified that neither Callahan nor IBM controlled the investigation. Arnold has pointed to no facts that indicate that IBM in any way controlled the police investigation or that the Task Force was in any sense a mere conduit for carrying out IBM's will.

In addition, Arnold has pointed to no facts that show that even if IBM had any influence on the Task Force, IBM in fact influenced the decision to investigate Arnold. We have seen no evidence that IBM ever considered Arnold a suspect before it went to the authorities. IBM's documents show that IBM considered Arnold as merely a possible source of information because of his association with Powers. They do not indicate that IBM ever believed that Arnold possessed any IBM documents, except perhaps at the time of the Powers incident that resulted in the hold harmless agreement. They do not indicate that IBM believed that Arnold had any knowledge of the 2314. They do not indicate that IBM believed that Arnold had any involvement in the theft of IBM documents.

Callahan testified that as of the time that IBM went to the authorities, he had no knowledge of Arnold's involvement. He further testified that he later had no knowledge of Arnold's involvement apart from the information that had been developed by the police in their recordings of the conversations between Bourget and Steckel, and their subsequent interviews. Captain Stuefloten, in his affidavit, states that the decision to arrest Arnold was made solely by the police. Bender made the same statement in his affidavit, and he also testified that he had made the decision to take the case to the grand jury based on his professional judgment. Arnold has pointed to nothing that indicates that IBM knew of his involvement in the theft of IBM documents prior to April 1973 or that the authorities had or used any evidence against Arnold that was not developed solely from the taped conversations between Bourget and Steckel.

The undisputed facts concerning defendants' involvement in the arrest and indictment of Arnold, and the search of Arnold's residence, established that their involvement with the Task Force did not proximately cause Arnold's injuries. It is true that IBM's involvement was certainly more than that of a mere complaining witness. The Seventh Circuit has held, however, that a person who supplies inaccurate information that leads to an arrest is not involved in joint activity with the state and, thus,

not liable under section 1983. *Butler v. Goldblatt Bros., Inc., supra,* 589 F.2d at 327. Defendants' involvement here does not rise to the level of involvement of the defendants in *Smith v. Brookshire Bros., Inc., supra,* 519 F.2d 93, on which Arnold relies. In *Smith,* the defendant department store and the local police department had a prearranged plan whereby the police would take shoplifting suspects to the police station and book them solely on the basis of the store employees' statements that the suspects had taken something without paying for it. The police detained the suspects "without independently establishing that there was probable cause to do so—they took the [suspects] into custody without a valid complaint having been filed and without knowing the facts to believe that a crime had been committed." *Id.* at 94. The court, analyzing these facts under the rubric of state action, affirmed the section 1983 judgment for the plaintiffs, holding that the department store was liable for the improper arrests when those arrests were made pursuant to a preconceived plan. *Id.* In the case before us, there is nothing to indicate that the authorities relied at all, let alone exclusively, on defendants' judgment in arresting and indicting Arnold, and in searching his residence. In addition, there was no preconceived plan to combat continuing violations as there was in *Smith.* Thus, we find that *Smith* is inapposite.

We conclude, then, that the undisputed facts show that defendants' involvement with the Task Force was not the proximate cause of Arnold's arrest, his indictment, or the search of his residence. Arnold emphasizes, however, that the causal connection between defendants' activities and his injuries was not so much what defendants did, but what they failed to do. Arnold alleges that defendants had evidence that was exculpatory to Arnold, and that defendants failed to disclose this evidence to the authorities. Arnold argues that if they had disclosed the exculpatory evidence to the authorities, he never would have been arrested, indicted, or had his residence searched.

The exculpatory evidence on which Arnold relies is that IBM knew that the 2314 information that Arnold possessed was not a trade secret. Bender stated in his affidavit that if he had known certain facts before the arrest and indictment of Arnold, that he would not have pursued the 2314 aspects of the case. IBM failed to mark the 2314 documents "confidential," and IBM's internal manual provided that information was not confidential unless so marked. An IBM list of trade secrets did not contain the 2314. In addition, IBM apparently failed to disclose that it had failed in certain civil suits to protect its trade secrets, that the 2314 technology was very similar to that of the 2311, which was not a trade secret, and that in 1971 IBM had executed a release of civil liability in favor of Arnold in connection with the Merlin documents that Powers possessed.

██ Bender stated further, however, that even with this knowledge he still would have sought some indictments. It is not clear whether Arnold was charged in the theft of trade secrets other than the 2314. It is clear, however, that he was charged in the arrest warrant with receiving stolen property and conspiracy to receive stolen property, and was subsequently indicted for conspiracy to receive stolen property. A person may be guilty of receiving stolen documents that purport to be trade secrets even if there are in fact no trade secrets contained in those documents. *See* Cal.Penal Code § 496 (West). That the stolen property charges against Arnold were not frivolous is indicated by IBM's recovery of those documents, pursuant to court order, after Arnold's motion to suppress was granted in his criminal proceeding. Thus, even if defendants knew that the 2314 information was not a trade secret, and withheld that information, Arnold still would have been arrested, indicted, and had his house searched. Therefore, defendants' action in withholding this information does not even rise to the level of causation in fact, let alone proximate cause.

## IV

Arnold has also appealed from the district judge's denial of certain motions for dis-

covery. We have observed that "[i]n granting discovery, the trial court is vested with broad discretion and will not be reversed except upon the clearest showing that denial of discovery results in actual and substantial prejudice to the complaining litigant." *Data Disc, Inc. v. Systems Tech. Assoc., Inc.*, 557 F.2d 1280, 1285 n.1 (9th Cir. 1977). As we understand Arnold's discovery arguments, the information that he seeks falls into two categories: (1) documents examined by the district judge in camera and ruled privileged under the work product doctrine or the attorney-client privilege; (2) documents that are under court ordered seal in other litigation involving IBM.

■ We have examined the in camera documents, and we are unable to say that the district judge abused his discretion in determining that these documents were privileged. In addition, we have found no significant information in these documents pertaining to the proximate cause issue, and therefore, Arnold was not prejudiced by the district judge's denial of discovery.

■ We are also unable to say that the district judge abused his discretion in refusing to permit discovery of documents under seal in three other cases involving IBM. Indeed, we are not sure that the district judge would have had the power to permit such discovery in light of the seals ordered by another district judge.

Arnold sought the documents directly in two of the other IBM cases, *Memorex Corp. v. IBM*, Nos. 78–3050, 78–3236, slip op. at 992, 636 F.2d 1188 (9th Cir. Nov. 18, 1980); and *Forro Precision, Inc. v. IBM*, Civ. No. 74–1653–RM (N.D.Cal.), *on appeal* No. 78–1755 (9th Cir.). His motions were denied in both of those cases. In the *Memorex* case, the district judge held that Arnold had failed to show that the documents sought were pertinent to his civil rights action. In both cases, the district court judges held that Arnold had failed to show that he could not obtain the documents he sought by other means. Those two orders denying Arnold's motions for discovery are not now before us, but we observe that Arnold still has made no showing that the documents

under seal in those cases are relevant to his case or that they are not available to him through some other means. For the same reasons, we conclude that Arnold would not be entitled to discovery of materials under seal in *United States v. IBM*, which is currently pending in the Southern District of New York.

AFFIRMED.