**Beresford N. SPRINGER, Plaintiff,**

**v.**

**Gretchen SEAMAN and Michael Seaman and Dorothy McGlincey, Individually and in her capacity as Postmaster of the Town of West Newfield, Maine and the United States Postal Service, Defendants.**

**Civ. No. 85–0243 P.**

United States District Court,
D. Maine.

July 15, 1986.

Harold L. Lichten, Angoff, Goldman, Manning, Pyle, Wanger & Hiatt, Boston, Mass., for plaintiff.

Theodore Kirchner, Robert F. Hanson, Norman & Hanson, Portland, Me., for Michael Seaman.

Paula D. Silsby, Asst. U.S. Atty., Portland, Me., for Gretchen Seaman, McGlincey & P.O.

George F. Wood, Paul W. McElhinney, Sanford, Me., for Seamans, McGlincey, individually.

## MEMORANDUM AND ORDER

GENE CARTER, District Judge.

In this action Plaintiff, a black man, alleges that he was wrongfully discharged from his position as an independent contract postal carrier for the United States Postal Service because of racially motivated machinations of Defendants Gretchen Seaman, Dorothy McGlincey and Michael Seaman. McGlincey and her daughter-in-law, Gretchen Seaman, are the postmistress and postmaster relief, respectively, in

West Newfield, Maine, the post office out of which Plaintiff works. Michael Seaman, the son of McGlincey and husband of Gretchen Seaman, is a selectman in the Town of West Newfield. The Complaint alleges violations of various civil rights statutes, 42 U.S.C. § 1981, 42 U.S.C. § 1985, 42 U.S.C. § 1986, 42 U.S.C. § 2000d, 42 U.S.C. § 1983, and of the Fifth and Fourteenth Amendments to the United States Constitution. Plaintiff also alleges pendent state claims for tortious interference with a contractual relationship and defamation.

The facts underlying the complaint are as follows. In December 1984, Karen Ring, a patron on Plaintiff's route, received a tax bill from the Town of West Newfield. Although the bill was sent by certified mail and had been signed for, neither Ring nor her husband had signed for it. Ring mentioned this to Gretchen Seaman, who determined that Plaintiff had signed for the mail. Plaintiff admitted signing for the letter and asserts that he had received permission to do so. Ring asked Gretchen Seaman what she was supposed to do with the letter and was told that that was Town business. Ring then asked to speak to Michael Seaman, a Town selectman, concerning what she should do with the letter. Seaman discussed Ring's conversation with the other selectmen, and he drafted a letter to the Postal Service under the signature of the Chairman, reporting a "complaint" from a taxpayer concerning a piece of certified mail. Within a few days of the selectmen's letter, Gretchen Seaman also wrote a letter to postal authorities complaining of other alleged malfeasances by Plaintiff. Gretchen Seaman had previously been documenting what she regarded as Plaintiff's failings in his duties and had reported them to McGlincey.

The Postal Service then commenced an investigation of Plaintiff to assess his honesty. This investigation did not deal specifically with any of the incidents about which Defendants had complained. Rather, In-

spector R.J. Moreland placed test letters, containing cash or bearer coupons, in Plaintiff's mail. The letters bore names and addresses that rendered them undeliverable. Plaintiff returned several of these letters to the post office. Bearer coupons contained in two of the letters were cashed, having been signed by Plaintiff's wife and mother-in-law. A postcard offering a free pen and pencil set contained in a third letter was received, having been completed and signed by the Plaintiff.

After interrogation by postal inspectors, Plaintiff ultimately confessed to taking the test letters and giving the bearer coupons to his wife. He signed a warning and waiver of rights form and in his own handwriting completed a written confession acknowledging his activities.[1] The details of the investigation and the signed statement of Plaintiff were forwarded to Paul E. Vogel, manager of the office with jurisdiction over Plaintiff's contract. The sworn declaration of Vogel, which is unrebutted in the present record, establishes that he was the only person authorized to terminate Plaintiff's contract and that he did so "based upon the findings of an investigation conducted by the Postal Service inspection and not upon any decision or recommendation of the Postmaster of West Newfield, Maine or any other employee at that Post Office acting on her behalf." Declaration of Paul E. Vogel, ¶ 11.

Defendants have moved for summary judgment on the grounds that there is an insufficient causal connection between their conduct and the harm asserted by Plaintiff. Under Fed.R.Civ.P. 56(c), summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Although the Court finds that the record, through

---

**1.** In testimony before the grand jury, which did not indict on this matter, Plaintiff testified that his confession was false and had been coerced by the postal inspectors. Plaintiff has alleged in a separate action in the Court of Claims that the Postal Service wrongfully breached its contract with him by terminating him for default.

affidavits and deposition testimony, generates many disturbing issues of fact concerning alleged racial animus and other improper motivations for Defendants' actions, these issues are not material in the sense required by Rule 56 because it has not been shown on the record before the Court that Defendants' actions were the legal cause of the harm alleged by Plaintiff. It is clearly the law, acknowledged by all parties, that proximate cause must be shown in actions alleging constitutional deprivations. *See, e.g., Beard v. O'Neal,* 728 F.2d 894 (7th Cir.1984).

The gravamen of the complaint in this case is that Defendants conspired and made false allegations about Plaintiff's job performance in order to cause the termination of his contract with the Postal Service and that his contract was terminated as a result of the false allegations. That Plaintiff's termination is the injury complained of is made plain by his brief opposing the summary judgment motion:

> The undisputed facts are that "but for" the defendants' actions, Mr. Springer would have never been investigated and would still have his position with the U.S. Postal Service.... The Seamans attempted to have Mr. Springer investigated by the U.S. Postal Service so that he would be terminated as a contract carrier. Their aim was to bring about an investigation and dismissal of Mr. Springer. Their actions were designed toward that end, and it was specifically that end which the defendants achieved. The ultimate injury suffered by the plaintiff was both directly and reasonably foreseeable by the defendants, and was the specific result of their convincing the

U.S. Postal Service that Mr. Springer unlawfully handled the mail.

Plaintiff's Memorandum at 8–9.

■ Although it is plain, as Plaintiff argues, that "but for" Defendants' actions there would likely have been no investigation, that is not, as Plaintiff acknowledges, the end of the inquiry. Whether described in terms of intervening cause or lack of proximate cause, the record before the Court demonstrates unequivocally that Plaintiff's *termination* was not the result of Defendants' actions. Postal Inspector Moreland's deposition establishes that the incident about which the complaints were made was not specifically investigated. Moreland Deposition at 148. Rather, the routine test-letter-type investigation, described above, was undertaken. The declaration of Paul E. Vogel leaves no doubt that it was the investigative memorandum, including Plaintiff's confession, which was the basis for Plaintiff's termination:

> Based upon a Postal Service Investigative Memorandum which indicated that Beresford Springer was responsible for the obstruction and/or theft of one or more identifiable pieces of mail entrusted to his care, Mr. Springer's contract was terminated by the undersigned in my official capacity as Manager of the Boston TMO.

Declaration of Paul E. Vogel, ¶ 5. Thus, although the immediate cause for the investigation [2] was Defendants' complaints, the immediate cause of the termination was the investigative memorandum, detailing, with Plaintiff's written concurrence, his misappropriation of mail.[3]

The Court of Appeals for the Ninth Circuit addressed a similar situation in *Arnold*

---

**2.** According to the Moreland deposition, Plaintiff might have been investigated at some point anyway, because random investigations of all contract carriers are carried out. Moreover, Moreland testified that the investigation might have been carried to completion even if he had discovered prior to the investigation that Plaintiff had not committed the offense about which complaint had been made. Moreland Deposition at 21, 150.

**3.** The Court here expresses no opinion on the procedures used in the investigation and termination or the validity of the termination. Although Plaintiff's memorandum asserts that the Postal Service investigation of Plaintiff violated its regulations, there are no allegations to that effect. In fact, there are no allegations at all concerning the inspectors or other Postal Service personnel with responsibility for investigations or concerning officer Vogel, the only Postal Service employee with authority to terminate Plaintiff's contract.

*v. International Business Machines,* 637 F.2d 1350 (9th Cir.1981). In that case, IBM became aware that certain trade secrets had been stolen and were in the possession of others. IBM employees met with representatives of the district attorney's office and a task force of legal and law enforcement personnel was formed to investigate the leak, using information that had been developed by IBM. Plaintiff Arnold's name was included in the information provided to the task force and he was described as among those persons who IBM thought might know the source of the leak. During the investigation, Arnold's name also turned up as a person who might have obtained IBM documents. A warrant for arrest was issued for Arnold, charging him with criminal conspiracy, theft of trade secrets and receiving stolen property, and a warrant was also issued for a search of his house. The affidavits used for the warrants included background information provided by IBM personnel. The search revealed many IBM documents which were identified by an IBM employee. Ultimately, the fruits of the search were suppressed and the indictment which had issued against Arnold was dismissed.

Arnold sued IBM under 42 U.S.C. § 1983 and 1985, alleging, among other things, that the defendants caused the preparation of the warrants knowing that the affidavits contained misstatements of fact. The district court held that Arnold had shown no facts to support his claim that the defendants were the cause of his arrest, search and indictment. The court of appeals affirmed, discussing causation at length. It observed:

> It is clear that "but for" IBM's involvement, there would have been no investigation, and Arnold never would have been arrested or indicted or had his residence searched.

> There is nothing in the record, however, to indicate that defendants exerted any control over the decision making of

the Task Force. Deputy District Attorney Bender testified that the Task Force used the information supplied by IBM to determine which companies might be in possession of IBM documents, but that the Task Force conducted a full and independent investigation. Bender and Sergeant Frechette both testified that neither Callahan nor IBM controlled the investigation. Arnold has pointed to no facts that indicate that IBM in any way controlled the police investigation or that the Task Force was in any sense a mere conduit for carrying out IBM's will.

*Id.* at 1357.

Although the court noted that IBM's involvement was "certainly more than that of a mere complaining witness," *id.,* it found determinative that "[i]n the case before us, there is nothing to indicate that the authorities relied at all, let alone exclusively, on defendant's judgment in arresting and indicting Arnold, and in searching his residence." *Id.* at 1358. The Court finds *Arnold* to be persuasive precedent on the issue of proximate cause on Plaintiff's federal law claims. The individual Defendants here had no control over the decision making that led to Plaintiff's contract termination. As in *Arnold,* the postal investigative division conducted a full and independent investigation, and it did not rely on Defendants' judgment in deciding to terminate Plaintiff's contract. Although Defendant Postal Service is alleged to have terminated Plaintiff's contract, it is alleged to have done so "as a result of the false allegations, threats and intimidation carried out by said individual defendants." Complaint, ¶ 15. On the record before the Court, that is clearly incorrect. Thus, the allegedly improper conduct of the Postal Service is not the cause of the harm alleged either.[4]

Plaintiff argues that *Arnold* is inapposite because "the court simply found that IBM had done nothing to bring about the prosecution of Arnold." Plaintiff's Memo-

---

4. The Court again points out that this Complaint contains no allegations concerning an improper motivation or possible racial animus on the part of those postal officials actually in charge of the investigation and termination.

randum at 9. The *Arnold* court noted that there were no facts to show that IBM in fact influenced the decision to investigate Arnold or that IBM considered Arnold a suspect before it went to the authorities. It is clear in *Arnold*, however, that the initial information about Arnold, which led to the investigation, was provided by IBM, much as the initial complaints about Plaintiff here were the acts of Defendants. In both cases, defendants were more than complaining witnesses. It was not the wishes or beliefs of the *Arnold* defendants that was determinative of the causation issue; it was the fact that IBM and its employees had no control over and had not specifically caused the harms complained of, the arrest, or indictment. *See Forro Precision, Inc. v. International Business Machines Corp.*, 673 F.2d 1045, 1049 n. 1 (9th Cir.1982) (related case in which court of appeals describes its holding in *Arnold*); *see also McLaughlin v. Alban*, 775 F.2d 389 (D.C.Cir.1985) (plaintiff "has provided no evidence to contradict the strong presumption the case law prescribes in favor of an independent investigation of the matter by Florida authorities").

Plaintiff urges the Court to consider *Clark v. Library of Congress*, 750 F.2d 89 (D.C.Cir.1984), in which the plaintiff was investigated by the FBI, at the behest of his employer, the Library of Congress, because of his membership in the Young Socialists Alliance. *Id.* at 98. In *Clark*, the plaintiff alleged that the scope of the investigation conducted of him was unwarranted and violative of his First Amendment rights. The district court, assuming that some investigation was warranted, held that the FBI and not the Library was responsible if the search was unreasonably intrusive. The court of appeals reversed, finding that "[u]nder applicable tort principles, the Library by virtue of the manner in which it induced the FBI investigation and its expectation that a full field investigation would in fact be carried out, became responsible for the full scope of the investigation conducted on Clark." *Id.* at 98.

The situation presented here is far different from the one presented in *Clark*, how-ever. There, the Library made a detailed request that the FBI conduct a five-part investigation of Clark and apparently because of "the manner in which [the Library] induced the investigation," *id.* at 98, that request controlled the course of the investigation. *Id.* at 98 and n. 13. Having no legitimate, independent reason for conducting such an investigation, the FBI became a conduit for carrying out the will of the Library. *Id.* at 92, n. 1; *see also Arnold* at 1357. This is unlike the situations posed in *Arnold* and in this case, where the investigations, while in a sense prompted by the defendants, were in no way controlled by them. In this case, in fact, the Postal Service did not even investigate the incidents about which complaint was made, but rather conducted a routine investigation of Plaintiff's job performance.

The Court also notes that while the investigation in this case is shown on the record to have been independent, the harm of which Plaintiff complains is at even one further step of remove from Defendants' alleged conduct. In *Clark*, one of the constitutional harms asserted was the scope of the investigation, which the court described at various points as "extraordinary," "injurious and intrusive." *Id.* at 95, 99. Except in passing in his brief, Plaintiff does not suggest that the investigation was unwarranted or unreasonably intrusive or overly broad, thus constituting a constitutional harm in itself. Rather, Plaintiff complains of his termination, which in a sense was caused by Plaintiff's own actions, whether misappropriation of mail or confession, while subject to the independent investigation.

A portion of Plaintiff's claim in this case, then, is actually more like plaintiff Clark's second claim, which was that he was denied many positions at the Library because of his political association and the investigation. Relying on *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), the court aptly stated the test for an employment discrimination claim: "Clark must demonstrate that his constitutionally

protected association with the YSA or the unlawful investigation that arose out of that association was a substantial or motivating factor in the Library's decision not to appoint Clark to any of the positions for which he applied." Applying this test, as necessarily modified for allegations of racial discrimination, it is evident on the record before the Court that Plaintiff's race was not a substantial or motivating factor in the Postal Service's decision to terminate him. As pointed out previously, the decision to terminate was made solely by Paul E. Vogel and was not influenced by anyone or anything other than the results of the investigation including the confession. The Complaint does not allege any racial animus or improper motivation on the part of Vogel.

Because the constitutional deprivation alleged by Plaintiff was not caused in a legal sense by the Defendants' alleged conduct, Plaintiff's civil rights and constitutional claims set forth in Counts I, II, III, IV, V and VI must be dismissed as against the individual Defendants. Since no allegations are made concerning wrongful practices by Defendant Postal Service or its employee with termination authority, which might have caused Plaintiff's alleged harm, the federal claims must be dismissed against Defendant Postal Service as well.

█ The Complaint also alleges two state law torts, defamation and tortious interference with a contractual relationship. In *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), the Supreme Court explained that the exercise of pendent jurisdiction over state law claims is a doctrine of discretion based on considerations of judicial economy, convenience and fairness to litigants. The Court stated that

> [n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a

jurisdictional sense, the state claims should be dismissed as well. *Id.* at 726, 86 S.Ct. at 1139. The concerns expressed in *Gibbs* as well as considerations of judicial economy persuade the Court that a dismissal of the state claims is in order. The Court sees no prejudice to the parties occasioned by such a dismissal, since Plaintiff is free to reassert his state claims in state court.

Accordingly, it is ORDERED that Defendants' motion for summary judgment is GRANTED on Counts I, II, III, IV, V and VI, and these counts are hereby DISMISSED. The pendent state claims set forth in Counts VII and VIII are also hereby DISMISSED without prejudice to their reassertion in state court.

So ORDERED.